**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **AARON DARNELL GRANT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **STEVEN T. MNUCHIN, Secretary,** | ) |
| **United States Department of Treasury,** | ) |
| | ) |
| **Defendant.** | ) |

Civil Action No. 15-1008 (RMC)

_____ )

## MEMORANDUM OPINION

Aaron Darnell Grant appeals a 2015 Final Order from the Merit Systems

Protection Board sustaining his second removal from the Department of the Treasury in 2013.

Appearing _pro se,_ Mr. Grant asserts that the 2015 Final Order did not sufficiently weigh his

proffered explanations for the incidents leading to his removal against Treasury's reasons for

discharge.  Secretary of the Treasury Steven T. Mnuchin, sued in his official capacity, moves for

summary judgment; Mr. Grant opposes.  The Court has fully considered the record and

conducted a telephone conference call with the parties, as requested by Mr. Grant.

## I.    FACTS

Aaron Darnell Grant worked as a Special Agent conducting criminal

investigations for the Internal Revenue Service (IRS or Agency), an agency within the

Department of the Treasury.  He was discharged for various forms of misconduct in 2010.  _See_

9/28/17 Mem. Op. [Dkt. 29].  Mr. Grant was reinstated to the IRS on September 4, 2012, after

the Merit Systems Protection Board (MSPB) found errors in the Agency's handling of his

discharge but without reaching the merits.[1]  Notice, Ex. 32, 2014 MSPB Initial Decision, AR

4190-91.[2]  On his first day back at work after his reinstatement in 2012, Mr. Grant met with his

first- and second-line supervisors, Supervisory Special Agent (SSA) Troy Burrus and Special

Agent in Charge (SAIC) Rick Raven, respectively.  *Id.*  SAIC Raven, who had had no role in any

of the relevant prior events, told Mr. Grant that he would review the whole matter and, upon

doing so, might re-propose Mr. Grant's removal.  *Id.*  On November 9, 2012, Mr. Grant filed an

EEO complaint, alleging discrimination based on his alleged disability (alcohol dependence) and

retaliation for his successful appeal to the MSPB; he did not allege that his race or sex was a

basis for any allegedly discriminatory actions.  *See* Notice, Ex. 30, Pl.'s Formal EEO Compl.,

AR 185-88.  This November 2012 EEO complaint is *not* before this Court.  *See* 9/28/17 Mem.

Op. [Dkt 29] at 12 n.2.[3]

By notice dated December 7, 2012, the Agency informed Mr. Grant that it was

proposing his removal again for three separate reasons:  (1) being less than candid in a matter of

official business (lack of candor); (2) failing to follow established Agency procedures; and (3)

failing to cooperate in an official investigation.  Notice, Ex. 18, Second Proposal to Remove

(Second Proposal), AR 217-18.  The Second Proposal set forth several "specifications" in

---

[1] The Board reinstated Mr. Grant with full backpay because of inappropriate communications between the Proposing Official and the Deciding Official concerning his discharge.  *See* Def.'s Partial Mot. to Dismiss Or, Alternatively, Partial Mot. for Summ. J., Ex. D, MSPB Final Order, Aug. 1, 2012 [Dkt. 25-5] at 2.

[2] The relevant portions of the Administrative Record are exhibits to Def.'s Notice of Filing Exhibits from Administrative Record (Notice) [Dkt. 54].  Each exhibit contains multiple documents, which are set out in an exhibit list filed with the Notice.  *See* Notice, List of Exhibits [Dkt. 54-2] (Ex. 1 contains Exs. 1-20 [Dkt. 54-3]; Ex. 2 contains Exs. 21-25 [Dkt. 54-4]; Ex. 3 contains Exs. 26-33 [Dkt. 54-5]).  The Court cites to Defendant's exhibit numbers as set out in the exhibit list, rather than the ECF exhibit numbers 1-3.

[3] This charge may be still pending before the EEOC in Case IRS-12-0804-F.  *See* 9/28/17 Mem. Op. at 12 n.2.  It has not been mentioned by either party and is therefore not addressed herein.

support of each reason. Each specification detailed at least one alleged violation of outstanding instructions:

> **Reason 1:** You were not candid in a matter of official business.

>> **Specification 1:** On April 30, 2010, [Treasury Inspector General for Tax Administration (TIGTA)] investigators asked you whether you had ever been in a car accident in your Government-Owned Vehicle (GOV). Your response, under oath, was "no." On May 3, 2010, while under oath, you told TIGTA investigators that on January 24, 2009, you were involved in a car accident while driving your GOV. In your affidavit dated May 3, 2010, you also stated that you were in an accident while driving your GOV. You were not candid in your response to TIGTA's official inquiry on April 30, 2010, regarding a matter of official business.

>> **Specification 2:** On April 30, 2010, TIGTA investigators asked you whether you had ever lost your credentials. Your response, under oath, was "no." On May 3, 2010, while under oath, you told TIGTA investigators that you had briefly lost your credentials while addressing a car accident. In your affidavit dated May 3, 2010, you also state that you briefly lost your credentials. You were not candid in your response to TIGTA's official inquiry on April 30, 2010, regarding a matter of official business.

> **Reason 2:** You failed to follow established procedures.

>> **Specification 1:** On or around January 24, 2009, you were involved in a car accident while driving your GOV. Agency procedures required you to immediately report any accident with your GOV to your supervisor. You did not do so. Therefore, you failed to follow established procedures.

>> **Specification 2:** On or around January 24, 2009, you were texting while driving your GOV which resulted in a car accident. You are responsible for exercising accident prevention and safe driving while operating a GOV. You failed to do so. Therefore, you failed to follow established procedures.

>> **Specification 3:** In or around January 24, 2009, while on duty, driving your GOV, and wearing your Service-issued firearm, you stopped for lunch. During lunch, you consumed two to five Long Island Iced Teas, an alcoholic beverage. When you finished lunch, you re-entered your GOV and drove it to another destination. As a special agent, you are prohibited from consuming intoxicants at any

time during the workday, including mealtimes, periods of leave when you intend to return to duty that day, and any time that you are operating a GOV or carrying a firearm. Your consumption of alcohol while on duty and while wearing your Service-issued firearm constituted a failure to follow established procedures.

**Specification 4:** On or around March 31, 2010, you consumed three to four Long Island Iced Teas, an alcoholic beverage, while attending a coworkers [sic] birthday party after hours. You left the party at approximately 9 p.m. and walked back to the office. You left the office at approximately 12 midnight driving your GOV. You are responsible for exercising accident prevention and safe driving while operating a GOV. You are also required to be able to respond in a safe and timely manner 24 hours a day. Your operation of your GOV after consuming alcohol constituted a failure to follow established procedures.

**Reason 3:** You failed to cooperate in an official investigation.

**Specification 1:** On May 3, 2010, while under oath, you told the TIGTA investigator that you no longer had the contact information for the other motorist involved in a car accident you had with your GOV. You told the TIGTA investigator that you would try to find the contact information. On May 14, 2010, the TIGTA agent telephoned you to see if you had located the requested contact information. You informed the agent that you would allow TIGTA to see the information but would not allow TIGTA to keep it and then you ended the telephone call. On May 17, 2010, you telephoned the TIGTA agent and asked how providing the requested contact information would help your case. The TIGTA agent advised you that the information was needed as part of the investigation. You never provided TIGTA with the requested contact information, which constituted a failure to cooperate in an official investigation.

*Id*. The Second Proposal also recited the materials the Agency relied upon in proposing Mr. Grant's removal, notified Mr. Grant of his right to review those materials, and provided the contact information for the Agency's Human Resources Specialist to whom he should address his request for the materials. *Id*. at AR 219-22.

On December 21, 2012, the Agency notified Mr. Grant that additional documents would be considered in support of the Second Proposal and provided him with copies of those documents. Notice, Ex. 19, Agency Letter re Additional Documents, AR 223. On January 17,

2013, Mr. Grant submitted his written response to the Second Proposal Letter, contesting each reason set forth in support of his proposed removal. Notice, Ex. 28, Pl.'s Reply to Second Proposal, AR 206-09.

With respect to the lack of candor charge, Mr. Grant contended that his collision with another vehicle while in his government-owned vehicle was a "near miss," not an accident, and that he had temporarily misplaced rather than "lost" his official credentials. *Id*. at 206-07; *see also* Pl.'s Statement of Genuine Issues in Opp'n to Def.'s Mot. for Summ. J. (Pl.'s SOF) [Dkt. 46-2] at 6; *cf* 2nd Am. Compl. [Dkt 23] ¶ 5 ("Plaintiff's government-owned vehicle (GOV) came in contact with another vehicle.").

With respect to the charge of failure to follow established procedures, Mr. Grant contested specifications one, two, and four, and admitted the third, that he had consumed alcohol while wearing his Service-issued firearm. He argued that: (1) since he was not in a car "accident," he was not required under Agency policy to report the event, *see* Mem. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Opp'n) [Dkt. 46-1] at 5-6; (2) the Agency had no specific policy prohibiting texting while driving and the practice had not been banned by an Executive Order at the time of the incident in January 2009, *see id*.; and (3) the Agency failed to introduce objective evidence to prove that he was intoxicated to a specific legal standard when he drove home on the night in question. 2d. Am. Compl. ¶ 96.

With respect to the charge of failure to cooperate in an official investigation, Mr. Grant believed that he was not required to provide the TIGTA investigator with contact information for the other motorist involved in the January 24, 2009 accident because it would have violated his Fifth Amendment privilege against self-incrimination. *See* Opp'n at 7.

On January 30, 2013, the Agency notified Mr. Grant that it had sustained all reasons and specifications in the Second Proposal and that his removal was effective as of that day. Notice, Ex. 29, 1/30/13 Decision Sustaining Second Proposed Removal, AR 202-05. The Deciding Official for the proposed removal was Sean P. Sowards, Deputy Director, Criminal Investigation. *Id.*

On December 11, 2013, Mr. Grant filed an appeal with the MSPB from the Agency's Decision on his second removal; he also alleged that discrimination and retaliation caused his discharge, based on his disability and prior protected activity. Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4162. On July 17, 2014, MSPB Administrative Judge Andrew Niedrick issued an Initial Decision upholding the Agency's findings on all charges and specifications that were asserted for Mr. Grant's second removal. *Id.* at AR 4158-213. Mr. Grant filed a timely Petition for Review by the MSPB. Notice, Ex. 33, 2015 MSPB Final Order, AR 4471. The two sitting members of the MSPB affirmed the Administrative Judge's decision on May 27, 2015, modifying it only to "clarify the administrative judge's analysis that [Plaintiff] failed to prove his due process claims." *Id.*

Mr. Grant filed his Complaint in this Court on June 26, 2015, and subsequently filed an Amended Complaint [Dkt. 7] on November 11, 2015 and the operative Second Amended Complaint [Dkt. 23] on August 19, 2016. He alleged violations of the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 *et seq.*, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973 (Rehab Act), 29 U.S.C. § 701 *et seq.* On the government's motion for partial summary judgment, this Court reviewed Mr. Grant's discrimination claims under Title VII and Rehab Act *de novo*. *Barnes v. Small*, 840 F.2d 972, 979 (D.C. Cir. 1988). Those allegations were dismissed on September 28, 2017, leaving

open for review Mr. Grant's appeal of MSPB's decision under the CSRA sustaining his second removal. *See* 9/28/17 Mem. Op. [Dkt. 29]; 9/28/17 Order [Dkt. 30]. The Court experienced an extended illness and several extensions of briefing deadlines were granted so the immediate motion for summary judgment did not become ripe for decision until January 31, 2019.

Almost immediately thereafter, on February 5, 2019, Mr. Grant filed an "Emergency Motion for Telephonic Conference." Mot. for Telephonic Conference (Mot. for Tel. Conf.) [Dkt. 50]. In that motion, he asserted *inter alia* that the 2010 TIGTA Report of Investigation used in the removal proceedings was "fraudulent," and "tampered with by agency officials to hide their misconduct before/during/after the TIGTA investigation." *Id*. at 1. The government filed an Opposition and Mr. Grant filed a Reply. *See* Def.'s Opp'n to Pl.'s Mot. for a Telephonic Conference (Opp'n to Tel. Conf.) [Dkt. 51]; Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for a Telephonic Conference (Reply re Tel. Conf.) [Dkt. 52]. The Court conducted a telephone conference with the parties on March 28, 2019. It addresses the motion below.

## II. LEGAL STANDARD

### A. District Court Review of "Mixed" Cases Before the MSPB

This matter involves Mr. Grant's appeal from the 2015 MSPB Final Order sustaining his second discharge in 2013. *See* 9/28/17 Mem. Op. at 14; 2d Am. Compl. The MSPB has jurisdiction over violations of the CSRA. As a general rule, jurisdiction over an MSPB Final Order lies in the Federal Circuit. *See* 5 U.S.C. § 7703. However, the instant matter came to this Court as a "mixed" case, meaning that it involves "both an agency action reviewable by the MSPB (*e.g.*, removal [under the CSRA]) and allegations that the action was motivated by unlawful discrimination." *Koch v. White*, 251 F. Supp. 3d 162, 169 (D.D.C. 2017); *see also* 5 U.S.C. § 7703(b)(2). When an employee appeals an MSPB decision covering violations of both the CSRA and federal antidiscrimination laws, jurisdiction lies in the federal district court. 5

7

U.S.C. § 7703(b)(2); *Ikossi v. U.S. Dep't of Navy*, 516 F.3d 1037, 1042 (D.C. Cir. 2008); *Williams v. U.S. Dep't of Army*, 715 F.2d 1485, 1491 (Fed. Cir. 1983) ("We hold that where jurisdiction lies in the district court under 5 U.S.C. § 7703(b)(2), the entire action falls within the jurisdiction of that court and this court has no jurisdiction, under 5 U.S.C. § 7703(b)(1), over such cases."). Where, as here, the Board granted a petition for review of the Administrative Judge's decision, the Board's decision constitutes the Final Agency Decision. *See White v. Tapella*, 876 F. Supp. 2d 58, 65 (D.D.C. 2012).

Different standards apply to this Court's review of an MSPB decision on adverse personnel actions under the CSRA and its review of an MSPB decision on discrimination claims. *See Hayes v. U.S. Gov't Printing Office*, 684 F.2d 137, 139 (D.C. Cir. 1982). A court considers a CSRA appeal to determine only whether the MSPB decision was "arbitrary or capricious, obtained without compliance with lawful procedures, unsupported by substantial evidence[,] or otherwise not in accordance with law," *Barnes*, 840 F.2d at 979. *See Hayes*, 684 F.2d at 137. In contrast, this Court conducted a *de novo* review of Mr. Grant's discrimination claims based on the legal standards applicable to Title VII and the Rehab Act. *Barnes*, 840 F.2d at 979; *see also Koch*, 251 F. Supp. 3d at 170.

**B. Motion for Summary Judgment**

Where no genuine issue of material fact exists, summary judgment is appropriate. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson,* 477 U.S. at 248. In ruling on a motion for summary judgment, a court must draw all justifiable inferences in the nonmoving party's favor. *Id.* at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. The nonmoving party must point to specific facts showing that a genuine issue of material fact exists

for trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party may not rely

solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999). Rather, the nonmoving party must present specific facts that would enable a reasonable

jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly

probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. The court may

treat any unaddressed factual statements in the defendant's motion as undisputed. *Winston &*

*Strawn, LLP v. McLean*, 843 F.3d 503, 507 (D.C. Cir 2016). "Summary judgment procedure is

properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### C. Jurisdiction and Venue

Courts "have an independent obligation to determine whether subject-matter

jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*,

546 U.S. 500, 514 (2006) (citation omitted). Federal district courts have jurisdiction to review

MSPB decisions in mixed cases involving the CSRA and antidiscrimination laws. *See* 5 U.S.C.

§§ 7702(a), 7703(b)(2); *Perry v. MSPB*, 137 S. Ct. 1975 (2017) ("The key to district court

review . . . [is] the employee's 'clai[m] that an agency action appealable to the MSPB violates an

antidiscrimination statute listed in § 7702(a)(1).'") (citation and internal quotation marks

omitted); *Brookens v. Acosta*, 297 F. Supp. 3d 40, 45 (D.D.C. 2018); *Ikossi*, 516 F.3d at 1042.

Venue is appropriate in this district under 28 U.S.C. § 1391(e) because the

Defendant, the Secretary of the Treasury sued in his official capacity, resides in the District of

Columbia and Mr. Grant was employed by the IRS in the District of Columbia. 28 U.S.C.

§ 1391(e)(1); *see also Smith v. Dalton*, 927 F. Supp. 1, 6 (D.D.C. 1996) (allowing suit against a

federal defendant under §1391(e)(1) where "he performs a significant amount of his official duties in this jurisdiction").

### III.    ANALYSIS

After the Court granted the government's motion for partial summary judgment, the parties turned to Mr. Grant's appeal of the MSPB 2015 Final Order affirming his removal under the CSRA.  Defendant now moves for summary judgment on that aspect of the case and Mr. Grant opposes.[4]

### A.  The 2015 MSPB Final Order

Mr. Grant argues that the 2015 MSPB Final Order "is not correct and should be ignored," because "Defendant cannot prove its charges as written even if it did not commit numerous due process violations and harmful procedural errors. . . ."  Opp'n at 3-4.  "When reviewing a decision of the MSPB, courts reverse the Board only if the Board's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]'; if it was 'obtained without procedures required by law, rule, or regulation being followed'; or, if it is 'unsupported by substantial evidence.'"  *Horn v. U.S. Dep't of Army*, 284 F. Supp. 2d 1, 10-11 (D.D.C. 2003) (citing 5 U.S.C. § 7703(c)).  Upon review, the Board upheld the Administrative Judge's findings that the Agency had proved, by a preponderance of the evidence, each of its charges and specifications proffered as grounds for Mr. Grant's second removal.  Notice, Ex. 33, 2015 MSPB Final Order, AR 4472-90.

---

[4] Def.'s Mot. for Summ. J and Mem. of P. and A. in Supp. of Its Mot. for Summ. J. (Mot.) [Dkt. 39]; Pl.'s Opp'n to Def.'s Mot. for Summ. J. and Mem. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Opp'n) [Dkt. 46-1]; Pl.'s Statement of Genuine Issues in Opp'n to Def.'s Mot. for Summ. J. (Pl.'s SOF) [Dkt. 46-2]; Reply in Further Supp. of Def.'s Mot. for Summ. J. (Reply) [Dkt. 49].

*1. Lack of candor*

To prove a lack of candor charge, an agency must demonstrate by a preponderance of the evidence that a federal employee failed to respond truthfully or completely when questioned about matters relating to proven misconduct. *Ludlum v. Dep't of Justice*, 278 F.3d 1280, 1284 (Fed. Cir. 2002). In its Second Proposal, the Agency asserted that Mr. Grant was not candid with the TIGTA investigators regarding (1) a car accident involving Mr. Grant's government-owned vehicle on January 24, 2009; and (2) the loss of his credentials stemming from that accident.

On April 30, 2010, Mr. Grant was interviewed by TIGTA investigators under oath. Notice, Ex. 7, 4/30/10 Mem. of Interview of Aaron Grant (4/30/10 Grant Interview), AR 383. He was asked if he had ever been in a car accident in his government-owned vehicle and he said that he had not. *Id.* During the same interview, he also told TIGTA investigators that he had never lost his credentials. *Id.* In a later interview under oath on May 3, 2010, Mr. Grant said that he had in fact been in a car accident in his government vehicle and that he had briefly lost his credentials at that time (he later found them in the car). Notice, Ex. 9, 5/3/10 Mem. of Interview of Aaron Grant (5/3/10 Grant Interview), AR 388-89. He also submitted an affidavit he had prepared, at the investigators' request, summarizing the information he had provided in answer to their questions on April 30. Notice, Ex. 9, Affidavit of Aaron Grant (Grant Aff.), AR 392. His May 3 Affidavit stated, "I would like to recant some of my answers that I provided to TIGTA Special Agents . . . ." *Id.* The May 3 Affidavit also stated that Mr. Grant had in fact had an accident in his government vehicle, explaining that "I got into a fender-bender on the on-ramp from Branch Avenue to Suitland Parkway going toward DC . . . . I was texting on my phone and lost concentration on the road and read-ended an individual." *Id.* at AR 393. The 2015 MSPB Final Order found "that statement is unambiguous." Notice, Ex. 33, 2015 MSPB Final Order,

AR 4475.  In his May 3 Affidavit, Mr. Grant also admitted that he was "unable to locate [his] credentials in [his] car temporarily."  Notice, Ex. 9, Grant Aff., AR 393.  Thereafter, Mr. Grant filed an accident report on July 22, 2010, unrelated to the TIGTA investigation, which corroborated the admission in his Affidavit that he was in an accident in 2009.  *See* Notice, Ex. 17, Mem. of Activity: Motor Vehicle Accident Report, AR 423-28.

Thus, Mr. Grant initially told TIGTA investigators under oath that he had not been in an accident but later directly contradicted his statements through his May 3, 2010 Affidavit and May 3, 2010 Interview, as well as his independent accident report filed in July 2010.

Administrative Judge Andrew Niedrick's Initial Decision found the TIGTA Special Agents' testimony regarding their Memoranda of Interview of the April 30 and May 3 interviews with Mr. Grant to be "credible and reliable," "consistent with their written statements and prior hearing testimony of record," and "sincere, straightforward, and consistent."  Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4172.  In contrast, the Administrative Judge found Mr. Grant to be "evasive, disingenuous, and willing to alter his version of events on the spot to achieve his desired end."  *Id*. at AR 4175.  The Administrative Judge concluded that Mr. Grant had demonstrated a lack of candor in his oral testimony, and credited the notes of the TIGTA Special Agents, their Memoranda of Interview, Mr. Grant's May 3 Affidavit, and Mr. Grant's own July 22 accident report.  In upholding his decision, the 2015 MSPB Final Order noted that the Administrative Judge made "detailed findings of fact and credibility determinations" and "explicitly relied on the demeanor of witnesses in assessing credibility."  Notice, Ex. 33, 2015 MSPB Final Order, AR 4473.  The Board's affirmance of the Initial Decision also found that Mr.

Grant had "effectively conceded on the face of his May 3 affidavit that he had been less than candid on April 30 . . . ." Notice, Ex. 33, 2015 MSPB Final Order, AR 4475.

Before this Court, as he did to the MSPB, Mr. Grant argues that the January 24, 2009 incident was only a "near-miss" and not an "accident" under IRS policy because it did not result in harm or significant damage, *see* Opp'n at 4, and that he was temporarily unable to locate his credentials but did not lose them. *Id.* In his brief to this Court, Mr. Grant argues that he

> thought he lost credentials while addressing the near miss, but he had not. They were in his GOV. Plaintiff told [Special Agent] Davis that he had to return to the location of the near miss to get his credentials to make her feel bad for not going to look for them [as he had asked]; he was joking with Davis.

*Id.* Special Agent Davis was Mr. Grant's "On-The-Job Instructor (OJI)." *Id.* This argument might honestly admit the joke but it does nothing to undercut the Agency's belief, the Administrative Judge finding, or the 2015 MSPB Final Order that he had lost his credentials for at least some period of time.

The Court finds and concludes that the administrative record provides substantial evidence to support MSPB's finding that the Agency proved both specifications regarding Mr. Grant's lack of candor by a preponderance of the evidence. Its conclusion was neither arbitrary nor capricious.

### 2. *Failure to follow established procedures*

Mr. Grant asserts that the Board's finding that the IRS proved he had failed to follow established procedures is plainly incorrect. The failure to follow established procedures charge comprised four specifications: (1) failure to report an accident in a government vehicle in a timely manner (IRM 1.14.7.2.8.4); (2) failure to engage in safe driving (IRM 1.14.7.2.8.3); (3) consumption of alcohol while wearing a Service-issued firearm (IRM 9.1.4.8); and (4) driving a

government-owned vehicle while under the influence of alcohol.  Notice, Ex. 18, Second

Proposal, AR 217-18.[5]

> a.   Specification 1:  Failure to Report Accident

Mr. Grant argues here, as he has before, that he was not in an accident, as defined

by agency guidelines.  *See* Opp'n at 5; Notice, Ex. 28, Pl.'s Reply to Second Proposal, AR 206-

09; Notice, Ex. 17, Mem. of Activity: Motor Vehicle Accident Report, AR 423-28.  In support,

he relies upon the IRM, which defines an "accident" as "an unexpected and undesirable event,

especially one resulting in damage or harm."  Notice, Ex. 28, Pl.'s Reply to Second Proposal, AR

206 (citing IRM 1.14.5-1).  Essentially, Mr. Grant argues that the incident on January 24, 2009

did not constitute an "accident" for reporting purposes under the IRM because there was no

resulting damage or injury.  In rejecting this contention, the Administrative Judge found that Mr.

Grant and the TIGTA investigators "had a common understanding of the word 'accident'" and

that Mr. Grant knew he had an obligation to report the January 2009 incident based on the record

evidence.  Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4178.  The Board affirmed this

finding.  Notice, Ex. 33, 2015 MSPB Final Order, AR 4475-76 ("Regardless of whether there

was observable damage to either vehicle in this collision, the appellant admitted that he was in an

accident and his later denial of being in an accident on April 30 lacked candor, as do his

assertions about a 'near miss' in his petition for review.").

This Court concludes that the 2015 MSPB Final Decision finding that Mr. Grant

failed to report an accident is supported by substantial evidence in the record and was neither

arbitrary nor capricious.

---

[5] Internal Revenue Manual (IRM) is a public document containing Internal Revenue Service
policies and procedures, available online through the Internal Revenue Service website, among
other places, https://www.irs.gov/irm (last visited Mar. 20, 2019).

b.  Specification 2:  Failure to Engage in Safe Driving

Mr. Grant contends that he did not violate Agency policy when he was texting and driving (which he admits caused him to rear-end another car), *see* 2nd Am. Compl. ¶ 5 ("Plaintiff's government-owned vehicle (GOV) came into contact with another vehicle."), because the Accident Prevention and Responsibility policy did not specifically prohibit texting, and because Executive Order No. 13513 had not yet prohibited texting while operating a government vehicle.  *See* Notice, Ex. 32, 2014 Initial MSPB Decision, AR 4180; Notice, Ex. 33, 2015 MSPB Final Order, AR 4477.  Mr. Grant told the MSPB that he was "driving safely while texting" because he could "text and still see the road."  *Id*. at 4477.  It is inarguably evident that Mr. Grant was not driving safely while texting, presuming that such a thing is possible, because he came in contact with the rear end of another vehicle while doing so.  As the Administrative Judge noted, the relevant IRS policy provision requires employees to exercise accident prevention and safe operation of government vehicles.  Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4180 (citing Notice, Ex. 21, Internal Revenue Manual, AR 260-62 (excerpt of IRM Policy 1.14.7.2.8.3, Real Estate and Facilities Management, Motor Vehicle Management)).  That policy provides specific examples of common driving errors, including "[i]nattentiveness . . . using cell phone" and "[d]istractions inside the vehicle."  *Id*.  Administrative Judge Niedrick found, and the MSPB affirmed, that Mr. Grant's argument attempted to ignore the plain language of the policy, "which specifically identifies cell phone usage and other distraction as a driving error."  *Id*. at AR 4181; *see also* Notice, Ex. 33, 2015 MSPB Final Order, AR 4477.  Because the policy language directly addresses cell phone usage, and Mr. Grant admitted to texting while driving, the existence (or not) of an Executive Order prohibiting texting at the time of the accident is irrelevant.

The Court concludes that MSPB had substantial evidence in the record as a whole, and was neither arbitrary nor capricious when it concluded that the Agency had proved that Mr. Grant failed to comply with Agency policy on safe driving.

c. Specification 3: Consumption of Alcohol—Lunch Incident

Mr. Grant admitted to TIGTA agents that he consumed several alcoholic beverages on a lunch break during work hours in March 2009 while wearing his Service-issued firearm. Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4166; *see also* Notice, Ex. 33, 2015 MSPB Final Order, AR 4476. Mr. Grant does not address this specification in his opposition to summary judgment and it is deemed conceded. The Court examines the allegations further only because Mr. Grant is no longer represented by counsel and proceeds on his own.

The Complaint alleges that MSPB erred because Special Agent Davis, his On-The-Job Instructor, was with him while he was drinking on duty, had a "responsibility to intervene" because she was "constructively aware" that Mr. Grant had an undiagnosed "alcohol dependence disability," and should have prevented him from driving.[6] 2d. Am. Compl. ¶¶ 92-93. Mr. Grant has presented no evidence that his colleague knew or had reason to know that Mr. Grant had a drinking problem. To the contrary, he himself later told investigators during an April 30, 2010 interview that "he did not and has never had a drinking problem." Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4167; *see also* Notice, Ex. 7, 4/30/10 Grant Interview, AR 380.

---

[6] Mr. Grant testified before the Administrative Judge that Special Agent Davis had consumed alcoholic beverages with him and then accompanied him in his government vehicle afterwards. Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4199. After he was shown his own prior sworn statements to the contrary, he changed his testimony and testified that "I have never said in the past that I saw her, I just said that I believe" that she consumed alcohol. *Id.* at AR 4199-200.

While the nature of a dependence disorder may often entail a lack of candor about it, there is no basis to infer knowledge or a duty to act by Special Agent Davis due to Mr. Grant's disability.[7]

The Court finds that MSPB had substantial evidence to support its finding on Specification 3, which Mr. Grant no longer contests. *See* Notice, Ex. 33, 2015 MSPB Final Order, AR 4476.

       d.   Specification 4:  Consumption of Alcohol—Birthday Celebration Incident

This specification stems from a birthday celebration for Mr. Grant's colleague Special Agent Reed, which Mr. Grant attended on March 31, 2010 and at which he admitted he consumed several alcoholic beverages. *Id*. at 4478; *see also* 2nd Am. Compl. ¶ 7 ("Plaintiff consumed alcohol while at party.").  In his April 30 interview with TIGTA, Mr. Grant candidly acknowledged that he "consumed three or four Long Island ice [sic] teas" at the birthday party in the District of Columbia and drove his government vehicle home several hours later. *See* Notice, Ex. 7, 4/30/10 Grant Interview, AR 380.  His deposition testimony prior to the 2014 MSPB hearing was consistent with his interview statements:

> Q: And then you were drunk when you drove home in your GOV that night?
>
> A: No, not drunk, but just under the influence. Like I said, for me as I described to the TIGTA Agent in my affidavit, I can consume a lot of alcohol without, you know, falling over. I'm not sure what your definition of drunk is. If you say, well, you feel light in the face or warm on the inside, then I'll say if you consider that drunk then I'll say that's drunk. But for me, I don't consider that drunk, I just feel that's me loosening up to things that I wouldn't normally be able to do if I wasn't under the influence of alcohol. That's pretty much it.

---

[7] Special Agent Davis was admonished for her lack of candor in failing to report Mr. Grant's conduct, including his consumption of alcohol while wearing a government-issued firearm and then operating a government-owned vehicle. *See* Def.'s Mot. to Dismiss, Ex. K, Davis Letter of Admonishment (Dec. 2, 2010) [Dkt. 25-12] at 1.

Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4182.

Mr. Grant argues that there is no evidence regarding his level of intoxication on that occasion but the argument does not render the 2015 MSPB Final Order incorrect. Agency policy requires no proof of intoxication to any standard; it flatly prohibits employees from consuming intoxicants "when the agent intends to return to duty that day. This includes . . . any time while operating a GOV or carrying a firearm." Notice, Ex. 33, 2015 MSPB Final Order, AR 4477 (citing Notice, Ex. 22, IRM 9.1.4, AR 279). Mr. Grant has admitted that he violated this policy by operating his government vehicle after consuming multiple alcoholic beverages. His own deposition testimony from years later, without regard to TIGTA investigators, proves his violation of Agency policy. *See* Notice, Ex. 33, 2015 MSPB Final Order, AR 4477-78

There was substantial evidence in the record for the MSPB to uphold Specification 4 and it was neither arbitrary nor capricious in doing so.

### 3. *Failure to cooperate in an official investigation*

The third reason the Agency relied upon in removing Mr. Grant for the second time was his refusal, after multiple overtures, to provide contact information to TIGTA investigators for the driver of the automobile he had rear-ended in January 2009. During their May 3, 2010 interview of Mr. Grant, TIGTA investigators asked him for contact information for the other motorist. Notice, Ex. 32, 2014 MSPB Initial Decision, AR 4183. At that time, Mr. Grant responded that he no longer had that information but would look for it. *Id*.; *see also* Notice, Ex. 9, 5/3/10 Grant Interview, AR 389 ("Grant described the driver of the other vehicle involved in the accident as a black male and said that he no longer had his contact information."). None of the following events, which led to Mr. Grant's failure to provide the requested information, is disputed. TIGTA agents called Mr. Grant on May 14, 2010 to ask again for the contact information; by that time he had apparently located the contact information

but would not send it to the agents. *See* Notice, Ex. 12, 5/14/10 Mem. of Interview of Aaron

Grant, AR 410 ("Grant advised that he would allow this special agent to see the documents but

would not allow this special agent to keep the documents. Grant ended the phone call."). Three

days later, Mr. Grant called TIGTA to ask how providing contact information for the other

motorist would "help his case." Notice, Ex. 13, 5/17/10 Mem. of Interview of Aaron Grant, AR

411. As far as the record reveals, Mr. Grant never provided the requested contact information to

TIGTA. He does not contest this fact on summary judgment.

   Instead, Mr. Grant argues that he was privileged by the Fifth Amendment to the

U.S. Constitution to refuse to provide contact information for the other driver because it might

have criminally incriminated him.[8] The Board considered this defense but found that a federal

employee has a Fifth Amendment privilege not to answer questions during an administrative

investigation only if he reasonably believes that his statements could be used against him in a

criminal proceeding, which did not apply to the TIGTA civil investigation as of April 30, 2010.

Notice, Ex. 33, 2015 MSPB Final Order, AR 4479; *see also Weston v. U.S. Dep't of Housing and

Urban Dev.*, 724 F. 2d 943, 947-48 (Fed. Cir. 1983); 2nd Am. Compl. ¶ 15 n.11 ("TIGTA

submitted the investigative file to the United States Attorney Office (USAO) for criminal

prosecution on June 15, 2010. USAO declined to accept the case for prosecution on July 14,

2010.").

   The MSPB considered all of Mr. Grant's arguments and defenses concerning his

alleged failure to cooperate with an official investigation. Substantial evidence in the record as a

whole supports the MSPB's finding that he, in fact, failed to cooperate. To that point, Mr. Grant

---

[8] U.S. Const. amend. V ("No person . . . . shall be compelled in any criminal case to be a witness
against himself.").

does not contest the facts but only the legal setting.  Having considered his defenses and rejected them in a reasoned opinion, the Court finds that MSPB was neither arbitrary nor capricious.

### B. Motion for Telephonic Conference

Mr. Grant asked for an emergency telephone conference because he believes the TIGTA Report of Investigation (ROI) is fraudulent and wanted to raise a number of other grievances regarding the case.  *See* Reply re Tel. Conf. at 6.  The Court heard from the parties by phone on March 28, 2019, limiting the discussion to the TIGTA ROI.

Mr. Grant explained that, in November 2018, he had remembered and recovered from an old phone photographs of the Special Agents' office configuration, as it had been in April 2010.  Looking at those photos, he observed that the desk arrangement made it almost physically impossible for him to have pulled the pony tail of Special Agent Reed, pushed her against a wall, and kissed her without consent on March 31, 2010.[9]  That observation led him to reconsider other parts of this long saga since 2010 and to the belief that his former colleagues had altered the ROI.  He complains that at least the date in the ROI is wrong as to when the TIGTA investigation started (either April 8 or 9, 2010) and that one or more pages was mis-punched.  Defendant responds that neither DOJ nor Treasury personnel have any reason to

---

[9] SA Reed filed an EEO complaint about the incident and an EEO investigation was conducted by EEO Specialist Stephen Tolbert, starting on April 15, 2010.  *See* Pl.'s SOF at 1.  Admitting the kiss, Mr. Grant insists that it was consensual.  *Id.* at 2 ("When [Mr. Grant] and Reed consensually kissed on March 31, 2010, [Mr. Grant] did not grab Reed by her ponytail, push her against a wall, and kiss her without consent. . . . (Reed's cubicle contained a U-shaped desk).").  Although he cites EEO Investigator Tolbert's notes in support, *see* Opp'n, Ex. 1 [Dkt. 46-3], those notes contain no reference to a wall at all but, rather, that Mr. Grant pushed himself against SA Reed.

The separate TIGTA investigation was conducted by TIGTA Special Agent Tracey Giannakoulias, beginning "on April 8, 2010 at 6:26 PM."  Pl.'s SOF at 1.

believe that the ROI is fraudulent or was tampered with by agency officials.  *See* Opp'n to Tel. Conf. at 2.

After the teleconference and at the Court's request, the government reviewed Bates Labeled Page 40 of the ROI, which Mr. Grant highlighted as different between the certified copy of the ROI (Certified ROI) the government sent to Mr. Grant and page 40 of the ROI in the administrative record (Record ROI), and filed a Notice with the Court.  *See* Def.'s Notice Regarding TIGTA Report (Notice re TIGTA ROI) [Dkt. 55].  Mr. Grant filed his opposition to the notice the following day.  *See* Pl.'s Resp. to Def.'s Notification Regarding TIGTA Report (Resp.) [Dkt. 56].  The March 28 Notice from the government states, as relevant, that page 40 of the Record ROI and the Certified ROI both show a single photograph of the front, driver-side door of the government vehicle driven by Mr. Grant, with two differences:  (1) the photograph in the Record ROI is a "poor photocopy of the photograph" while it is "a much clearer image" in the Certified ROI, Notice re TIGTA ROI ¶ 4; and (2) "the orientation of the image in page 40 of the Certified ROI is rotated 180 degrees, . . . [so that] the image reflecting the front of the vehicle is at the top of the page [in the Record ROI and] . . . at the bottom of the page" in the Certified ROI.  *Id.* ¶ 5.  Counsel attests that "[n]either the holes punched at the top of the document nor the difference in orientation change or obscure the information conveyed in the depictions."  *Id.*

The Court appreciates the strong advocacy with which Mr. Grant has pursued his case since his counsel withdrew.  The errors he alleges in the ROI do not support his allegations of fraud and are not material to the Court's review of the 2015 MSPB Final Order.  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *See Anderson*,

477 U.S. at 248. In this context, "material" means of sufficient importance to cause a change in the Court's opinion on review.

- Whether the TIGTA Investigation began at 6:26 PM on April 8, 2010 as Mr. Grant states, Pl.'s SOF at 1, or the next day on April 9, 2010 is not important. Perhaps the investigation was assigned on April 8 and work begun on April 9. In any event, the difference makes no difference to events and does not rise to the level of materiality or "fraud."

- The difference between a "poor photocopy" of the 2010 photograph on which the MSPB relied in 2015 and "a much clearer image" sent to Mr. Grant in 2018 is also not sufficiently "different" to be material on review of the 2015 MSPB Final Order. It could be that the "poor photocopy" was too poor to be copied again and so a "much clearer" image was sent to Mr. Grant, allowing him to see it. Critically, identical photographs are depicted on Page 40 of both Record ROI and the Certified ROI, without material difference between them.

- The change in orientation of the photograph from the Record to Certified ROI does not reduce its reliability as a photo of the government-issued vehicle driven by Mr. Grant in 2009 and he does not make that argument. The orientation does not have any material impact on what the photo depicts. The Court cannot infer "fraud" because of such a change.

- The furniture layout in the Special Agents' office in March 2010, as shown by Mr. Grant's recently-rediscovered photos, is not entirely "new" information because Mr. Grant has already argued that SA Reed's cubicle contained a U-shaped desk, suggesting that he could not, therefore, have pushed her against a wall. *Id*. at 2. While Mr. Grant

wants to rebut the idea that he so pushed SA Reed, nothing in the exhibit he cites states that such an allegation was made. Finally, the *entirety* of the EEO complaint against Mr. Grant is irrelevant to his second discharge as the Agency did not rely upon it to support his removal.

- Mr. Grant's Response asserts that he "is one hundred percent (100%) certain" that the TIGTA ROI in the Administrative Record "is false and fraudulent with the intent to mislead." Resp. at 1. The Court has read and considered his Response and its attachments and does not agree.

- The Response further contends that Mr. Grant's colleagues, both black and white, conspired to lie about him because he is black. *Id*. at 4. He asserts that "MSPB bought what Defendant was selling" only because Mr. Grant is black. *Id*. Mr. Grant is firmly convinced that "[t]his case is no more than a 'high-tech' lynching of a black man . . . only because he had consensual sexual relations with two of his female coworkers 15 months apart." *Id*. Such allegations are not only scandalous but highly speculative and without support.

- Most critically, Mr. Grant fails and refuses to appreciate how much his own statements formed the basis for his Second Removal. Those statements are worlds apart from the angry diatribe in the Response.

The Court heard from Mr. Grant directly after he sought an emergency telephone conference because he alleged fraud and appears without counsel; the Court has also considered his Response to the government's March 28 Notice. Having granted his motion, heard his arguments, asked government counsel to compare directly the page upon which Mr. Grant

particularly focused, and considered the materiality of his claims to the issues on review under the CSRA, the Court finds no reason to pursue the allegations further.

## IV.    CONCLUSION

For the reasons stated above, this Court finds that the 2015 MSPB Final Order concerning Mr. Grant's discharge is supported by substantial evidence on the record as a whole, is not arbitrary or capricious, and is otherwise in accord with law.  Summary judgment will be granted to the Defendant.  A memorializing Order accompanies this Memorandum Opinion.


Date:  March 29, 2019

_____
ROSEMARY M. COLLYER
United States District Judge